GRUENDER, Circuit Judge,
dissenting.
Because I conclude that the district court abused its discretion when it certified the breach of warranty class and the negligence class, I respectfully dissent.
I. DISCUSSION
A. Breach of Warranty Class— Standing
The court holds that those plaintiffs in the warranty class who own Zurn fittings that have not failed or leaked- — the so-called “dry plaintiffs” — have suffered an injury and have stated “cognizable [claims] under Minnesota warranty law.” Ante at 617. To reach this conclusion, the court improperly characterizes our precedent and overlooks the axiom that “liability does not exist in a vacuum; there must be a showing of some damage.” Briehl v. Gen. Motors Corp., 172 F.3d 623, 628 (8th Cir. 1999) (quoting Feinstein v. Firestone Tire & Rubber Co., 535 F.Supp. 595, 602 (S.D.N.Y.1982)).
“On every writ of error or appeal, the first and fundamental question is that of jurisdiction.” Great So. Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453, 20 S.Ct. 690, 44 L.Ed. 842 (1900). Failure to establish standing deprives this court of jurisdiction to hear the suit. Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The “core component of standing is an essential and unchanging part of the case- or-controversy requirement of Article III.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The dry plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing that they have standing. See id. at 561, 112 S.Ct. 2130. As such, a class may only “ ‘be defined in such a way that anyone within it would have standing[,]’ and ... a named plaintiff cannot represent a class of persons who lack the ability to bring suit themselves.” Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1034 (8th Cir.2010) (quoting Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir.2006)).
The party asserting standing must demonstrate that he “has suffered an ‘injury in fact’ — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.” Republican Party of Minn. v. Klobuchar, 381 F.3d 785, 791-92 (8th Cir.2004) (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130). As the court today notes, “the question whether [a plaintiff] has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief.” Braden v. WalMart Stores, Inc., 588 F.3d 585, 591 (8th Cir.2009); see also Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (stating that the inquiry into whether the party asserting standing has shown an injury in fact “often turns on the nature and source of the claim asserted”). We review a district court’s determination that a party has standing de novo. Constitution Party of S.D. v. Nelson, 639 F.3d 417, 420 (8th Cir.2011).
“Courts have been particularly vigilant in requiring allegations of injury or damages in products liability cases.” Briehl, *621 172 F.3d at 627. Central to the analysis is an allegation of not only an alleged defect, but also the manifestation of that defect. At this critical juncture in the analysis, the district court veered off course and applied the wrong legal standard: “Plaintiffs need only allege and prove that the brass fittings are defective and do not conform to the warranty. They are not required to allege and prove a manifestation of that defect.” In re Zurn Pex Plumbing Prods. Liab. Litig., 267 F.R.D. 549, 564 (D.Minn. 2010). ' Such a statement is without support in our circuit. In fact, “[i]t is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own.” Briehl, 172 F.3d at 628 (quoting Weaver v. Chrysler Corp., 172 F.R.D. 96, 99 (S.D.N.Y.1997)).
Although the court today applies the proper legal standard, it nonetheless holds that the dry plaintiffs have alleged a cognizable injury. In doing so, the court misapplies our decision in O’Neil v. Simplicity, Inc., 574 F.3d 501 (8th Cir.2009). In that case, John and Jill O’Neil purchased a crib that featured a drop-side mechanism — a mechanism allowing one side of the crib to be lowered, “making it easier to place a child into and remove it from the crib.” Id. at 502. Four years after the O’Neils purchased the crib, the Consumer Product Safety Commission and the manufacturer “announced a voluntary recall of about one million cribs ... prompted by a hardware defect that made it possible for the drop-side to detach from the crib, creating a dangerous gap in which a child could get caught.” Id. The O’Neils sued the manufacturer for, inter alia, breach of express and implied warranties. Id. at 503. The plaintiffs purported to represent a class of all persons in Minnesota who had purchased a crib, excluding any individuals who suffered a personal injury as a result of the allegedly defective crib.
In their brief to our court, the O’Neils argued that “Plaintiffs’ crib contains a serious hardware defect that allows the drop side to separate from the crib frame. This hardware defect creates a gap that allows an infant or child to be trapped between the drop side and the crib frame. The defect is present in over 1 million of Defendants’ cribs.... ” In their reply brief, the O’Neils stressed that “each and every Graco crib has ‘older-style hardware’ that causes the drop side to detach from the crib frame and creates an entrapment gap that injures infants and small children. The Graco crib model that the Plaintiffs purchased for their grandchildren to sleep has this defect” (emphasis in original). Thus, the O’Neils argued, “Plaintiffs have pleaded the existed [sic] of a specific defect that has exhibited or ‘manifested’ itself in the Graco crib that the Plaintiffs own.”
Our court was not persuaded. Even though the O’Neils alleged that their crib contained a defect that had manifested itself in the drop-side hardware, the court held that the O’Neils had failed to state a cognizable warranty claim because they had not alleged that “a separation [of the drop-side] ha[d] ever occurred in their crib.” O’Neil, 574 F.3d at 503. For a claim to succeed, we held that “plaintiffs must allege that their product actually exhibited the alleged defect.” Id. As such, where “a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies.” Id. at 504 (quoting Briehl, 172 F.3d at 628). The O’Neils’ claim failed because, while they alleged that the hardware defect was manifest in their crib, they did not allege that the defect resulted in the separation of the drop-side from the crib. In essence, we held in O’Neil that simply owning a product with an alleged defect does not give *622 rise to a warranty claim until that defect causes the product to perform unsatisfactorily. Id. (finding that “the O’Neils’ crib has not exhibited the alleged defect” even though the O’Neils alleged that a defect had manifested).
Just as the O’Neils alleged that the defect had “manifested” simply by the existence of the hardware in their crib, the dry plaintiffs here argue that “the chemical and physical process of [stress corrosion] cracking[] is already manifest in all systems.” Likewise, just as the O’Neils failed to allege that the hardware defect resulted in the drop side separating from their crib, the dry plaintiffs fail to allege that the process of stress corrosion cracking has caused leaks in their Zurn fittings. See id. at 505 (“The O’Neils’ crib performs just as it was intended, and thus there is no injury and no basis for relief.”).
The court today misconstrues our decision in O’Neil in at least two ways. First, the court attempts to distinguish that decision by stating that the O’Neils “had not alleged that their cribs actually exhibited a dangerous defect that might have harmed their children” but instead only had alleged “a mere likelihood that a crib might develop a dangerous defect.” Ante at 616. To the contrary, the O’Neils did not allege merely that their crib was at risk of developing a hardware defect; they expressly alleged that “each and every Graco crib” had defective hardware — a defect that might have harmed their children. We held that such allegations were insufficient because the hardware defect had not manifested itself: the drop-side had not separated from the crib and the crib continued to perform as intended. Second, the court attacks a straw man, stating that “O’Neil never indicated that a child would have to be injured by a crib for a defect to be manifest.” Ante at 617. While true, this distinction sheds no light on the inquiry. If the O’Neils had alleged merely that their drop side had separated from their crib — with no accompanying allegation of injury to a child — the alleged defect in the crib’s hardware would have manifested, the crib no longer would have functioned as intended, and the O’Neils would have had a cognizable claim. By analogy, if the dry plaintiffs had alleged that their Zurn fittings exhibited leaks, the alleged defect would be manifested, the plumbing products would no longer have functioned as intended, and the dry plaintiffs would have a cognizable claim. But the dry plaintiffs have not alleged this — and thus they have not alleged a sufficient injury to establish standing.
Like the O’Neils, the dry plaintiffs attempt to circumvent this problem by alleging that they have suffered an economic injury. According to the O’Neils’ brief, they sought “the benefit of their bargain with Defendants, or the difference in the value of the crib they were promised, namely a fully functioning drop side crib ... and what they received, a crib containing a hardware defect that makes the crib an unsafe environment for children and prevents the drop side from functioning as represented.” According to the dry plaintiffs in the instant case, their economic injury includes “the decreased value — because of the inherent defects — of the plumbing itself’ and “the cost of replacing systems.” Further, the dry plaintiffs argue that the Zurn products they received — fittings subject to the process of stress corrosion cracking — do not conform with the products which they were promised — fittings that would “outlast the life of a home.” We rejected the “benefit of the bargain” argument in O’Neil: “[t]he problem with this argument is that, because the O’Neils’ crib has not exhibited the alleged defect, they have necessarily received the benefit of their bargain. The O’Neils purchased a crib with a functioning *623 drop-side and that crib continues to have a functioning drop-side.” O’Neil, 574 F.3d at 504. In other words, even though the O’Neils alleged that their crib exhibited defective hardware, they received the benefit of the bargain because the alleged defect had not resulted in the crib not performing as it was intended. Likewise, the dry plaintiffs purchased Zurn fittings that have functioned as intended from the date of purchase to the date they filed this litigation. Therefore, they too have received the benefit of the bargain.
The Fifth Circuit reached a similar conclusion in Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315 (5th Cir.2002). In that case, Elizabeth Rivera purchased and ingested Duract, a Wyeth-manufactured painkiller. Soon after receiving complaints of liver failure from patients taking the drug, Wyeth removed Duract from the market. Rivera, for whom Duract functioned as intended and did not cause liver problems, sought to represent a class of “all patients who were prescribed, had purchased, and had ingested Duract but suffered no physical or emotional injury.” Id. at 317. Rivera argued that she had suffered a concrete economic injury in that she had not received the benefit of the bargain because she purchased a defective drug that was thought to be much safer than it was. Had patients known of Duract’s risks to the liver, Rivera claimed she would have been able to purchase Duract for a lower price, presuming that riskier drugs command a lower market price. A panel of the Fifth Circuit unanimously disagreed and held that Rivera, and the members of the putative class, lacked standing because they had not alleged a concrete and particularized injury to a legally protected interest: “Rivera paid for an effective pain killer, and she received just that — the benefit of her bargain.” Id. at 320. “Duract worked. Had Wyeth provided additional warnings or made Duract safer, the plaintiffs would be in the same position they occupy now.” Id.
Just as the plaintiffs in Rivera and O’Neil received the benefit of their bargain, so too did the dry plaintiffs in this case. The dry plaintiffs bargained for, and now own, Zurn fittings that function exactly as intended.[9] See id.; cf. In re Canon *624 Cameras Litig., 237 F.R.D. 357, 360 (S.D.N.Y.2006) (“A plaintiff who purchases a digital camera that never malfunctions over its ordinary period of use cannot be said to have received less than what he bargained for when he made the purchase.”).
I would conclude that, until the defect they allege manifests so that their Zurn fittings no longer perform as intended, the dry plaintiffs have suffered no injury in fact — economic or otherwise — and, therefore, lack standing. See O’Neil, 574 F.3d at 505; Rivera, 283 F.3d at 320; Briehl, 172 F.3d at 628-29.
B. Breach of Warranty Class — Predominance
Questions of law and fact common to the remaining members of the breach of warranty class — those members whose Zurn plumbing products exhibit leaks and no longer perform as intended — do not predominate over questions affecting individual members. Thus, I would conclude that the putative breach of warranty class fails to meet the predominance requirement of Fed.R.Civ.P. 23(b)(3).
“A court may certify a class under Rule 23(b)(3) only if it finds that ... the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.” Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir.2001) (citing Fed.R.Civ.P. 23(b)(3)); see also Avritt, 615 F.3d at 1029. “In making its [predominance] determination, the district court must undertake a ‘rigorous analysis’ that includes examination of what the parties would be required to prove at trial.” Avritt, 615 F.3d at 1029 (citing Elizabeth M. v. Montenez, 458 F.3d 779, 786 (8th Cir.2006)). “The court may also be called upon to ‘resolve disputes concerning the factual setting of the case.’ ” Id. (quoting Blades v. Monsanto Co., 400 F.3d 562, 575 (8th Cir.2005)).
Such a rigorous analysis is even more appropriate in light of the amendments made to Rule 23 in 2003. “First, the amended rule removes from prior Rule 23(c)(1)(C) the provision that class certification ‘may be conditional.’ Second, the amended rule replaces the provision of prior Rule 23(c)(1)(A) that a class certification decision be made ‘as soon as practicable’ with a provision requiring the decision ‘at an early practicable time.’ ” Miles v. Merrill Lynch & Co., (In re Initial Pub. Offering Sec. Litig.), 471 F.3d 24, 39 (2d Cir.2006). Moreover, “the Advisory Committee states that ‘[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met.’ ” Id. (alteration in original) (citing Fed.R.Civ.P. 23(c)(1)(C) Adv. Comm. Notes 2003).
Before it determined that the breach of warranty class met the predominance requirement, the district court conceded that, “[b]ecause Zurn’s warranty specifically excludes failures due to improper installation and corrosive water quality, individual questions of proximate cause may exist as to class members whose Zurn[] brass crimp fittings have already failed and who have suffered resulting property damage.” In re Zurn Pex Plumbing, 267 F.R.D. at
*625 563. The district court concluded, however, that because the vast majority of the class had “not suffered property damage and seek only replacement of a nonconforming product,” proximate cause issues would not predominate. Id.
Because I would hold that the dry plaintiffs lack standing, the only remaining members of the putative breach of warranty class are those whose fittings already have leaked. For these remaining plaintiffs, individual questions of causation predominate over common questions. To establish a warranty claim in Minnesota, a plaintiff must prove (1) the existence of a warranty, (2) a breach of that warranty, and (3) a causal link between the breach and the alleged harm. See Peterson v. Bendix Home Sys., Inc., 318 N.W.2d 50, 52-53 (Minn.1982). The Zurn express warranty excludes failures or leaks caused by, inter alia, “damage due to tear, breaks or other external damages before, during, or after installation,” “exposure to harmful, unauthorized, or unanticipated chemicals or substances or corrosive water conditions,” and “damage or wear from abnormal operating conditions, accident, abuse, misuse, or unauthorized alterations or repair.” Zurn’s expert opined that those plaintiffs who relied on well water or used water softeners subjected their fittings to an extremely corrosive environment. As such, for the plaintiffs to prove that their Zurn fittings failed because of stress corrosion cracking and not because of any one of the number of reasons excluded from warranty coverage, the district court will be forced to engage in individual factual inquiries regarding the installation and operating conditions of each homeowner’s Zurn plumbing products. Even if all Zurn fittings eventually will fail from stress corrosion cracking, another factor, like improper installation, abnormal operation, or exposure to corrosive water conditions, still may have caused the failure and property damage experienced by these plaintiffs. In other words, even “if the plaintiffs’] general allegations are true,”[10] Blades, 400 F.3d at 566, common evidence would be insufficient for these plaintiffs to prove their breach of warranty claim. Therefore, I would conclude that the district court abused its discretion by certifying the breach of warranty class.
C. Negligence Class — Predominance
Similar individual issues of causation predominate over common issues for those plaintiffs in the negligence class. The district court found that “[a] fact question does exist as to whether the failures are due to a single cause or multiple causes. If Plaintiffs can prove that the crimp fittings suffer from a uniform, inherent design and manufacturing defect, and that the defect is the only cause of failure in the majority of the cases, then proximate *626 cause will not involve predominantly individual determinations.” In re Zurn Pex Plumbing, 267 F.R.D. at 565. This conclusion is problematic. As an initial matter, the district court’s reasoning is circular: essentially, according the district court, if the plaintiffs can prove proximate causation through common evidence, “then proximate cause will not involve predominantly individual determinations.” See id. This conclusion is merely a restatement of the predominance inquiry.
More importantly, to show that stress corrosion cracking was the proximate cause of the failure, each plaintiff will need to prove that his property damage was caused by an inherent defect in Zurn’s fittings — and, alternatively, not caused by corrosive water conditions, improper installation, improper use, abnormal operating conditions, or another factor. As such, this inquiry will be inherently individual in nature and not conducive to class-wide resolution. Moreover, Zurn has presented expert testimony that stress corrosion cracking occurs only when its fittings are subjected to unusual stress and a corrosive environment. The district court did not undertake a “rigorous analysis” regarding the contradictory testimony of the parties’ experts to determine whether stress corrosion cracking requires a corrosive environment or whether stress corrosion cracking occurs in any water within the lifetime of the fittings. Without resolving this question, I see no way to determine whether common proof is sufficient for the plaintiffs’ case to succeed. While this inquiry bleeds into the merits, it is necessary to determine the factual setting of the case. “A district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits. Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives.” West v. Prudential Sec., Inc., 282 F.3d 935, 938 (7th Cir.2002). Therefore, because individual issues of causation predominate over common issues, I conclude that the district court also abused its discretion by certifying the negligence class.
D. Daubert and Class Certification
While I would not have reached the question of whether the district court should have conducted a full inquiry into the admissibility of the plaintiffs’ experts’ testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), I disagree with the court’s discussion and analysis of this issue.
First, the court errs by characterizing our decision in Blades as controlling this question, see ante at 612-13, because Blades did not address it. In Blades, the defendants asked the district court to conduct a full Daubert inquiry into the admissibility of the testimony of the plaintiffs’ key expert. The district court refused to address admissibility under Daubert, stating that “I believe it is appropriate for me to consider all evidence at this stage of the proceedings.” Blades, 400 F.3d at 569 (quoting the district court). After the district court considered the plaintiffs’ expert evidence, it ruled in favor of the defendants, determining that the “[expert] testimony does not show that impact can be demonstrated on a class-wide basis.” Id. (quoting the district court). We affirmed and held that, “in ruling on class certification, a court may be required to resolve disputes concerning the factual setting of the case. This extends to the resolution of expert disputes concerning the import of evidence concerning the factual setting .... ” Id. at 575. “[W]e believe the district court’s findings as to the experts’ disputes were properly limited to whether, *627 if appellants’ basic allegations were true, common evidence could suffice, given the factual setting of the case, to show class-wide injury.” Id. (emphasis added).
Thus, our decision in Blades addressed the scope of the district court’s fact finding with respect to conflicting expert testimony, not whether the testimony should have been admitted in the first place. Because the defendants in Blades prevailed in the district court and, therefore, did not appeal the district court’s refusal to conduct a full Daubert analysis, the court in Blades simply was not presented with and did not decide the question of the admissibility of the proffered expert evidence under Daubert. As such, the question of the appropriate scope of a district court’s Daubert inquiry at the class certification stage was not decided by the court in Blades and has remained an open question until the court’s decision today.
To resolve this open question, I note first that the Supreme Court has expressed disapproval of the position taken by the court today. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. -, 131 S.Ct. 2541, 2553-54, 180 L.Ed.2d 374 (2011) (“The District Court concluded that Daubert did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so .... ” (internal citation omitted)). “The statement, to be sure, is dictum, ... but inferior courts can take their cues from the Supreme Court’s dicta.” Scheduled Skyways, Inc. v. Nat’l Mediation Bd., 738 F.2d 339, 342 (8th Cir.1984). Second, I find appropriate the standard expounded by two of our sister circuits. In American Honda Motor Co. v. Allen, 600 F.3d 813 (7th Cir.2010) (per curiam), the district court certified a class of Honda motorcycle purchasers who alleged that the front steering assembly of their GL 1800 motorcycles “wobble[d],” or shook excessively. Id. at 814. Plaintiffs’ expert stated that any wobble or oscillation of the steering assembly should dissipate within one second so as to prevent riders from reacting to it. Based on the test of one GL 1800 motorcycle, the expert concluded that all GL 1800 motorcycles failed the standard he had devised and, thus, were defective. Honda argued that the expert’s opinions failed the reliability standards established by Daubert. While the district court expressed reservations about the reliability of the opinions, the court declined to strike the expert’s report “at this early stage of the proceedings,” id. at 815 (quoting the district court), and granted plaintiffs’ motion for class certification.
The Seventh Circuit reversed and held that, “when an expert’s report or testimony is critical to class certification, as it is here[,] ... a district court must conclusively rule on any challenge to the expert’s qualifications or submissions prior to ruling on a class certification motion. That is, the district court must perform a full Daubert analysis before certifying the class if the situation warrants.” Id. at 815-16. Because plaintiffs relied on their expert’s opinion that there was a defect common to all GL 1800 motorcycles to meet the Rule 23(b)(3) predominance requirement and because the district court must determine predominance before certifying a class, the Seventh Circuit concluded that the district court could not defer a conclusive analysis of the reliability and admissibility of this evidence to a later date.
The Eleventh Circuit applied American Honda’s holding in Sher v. Raytheon Co., 419 Fed.Appx. 887, 2011 WL 814379 (11th Cir. Mar. 9, 2011) (unpublished) (Hill, J.). The district court in Sher had certified a class despite marked differences between the expert testimony presented by the parties, stating:
*628 [I]t is not necessary at this stage of the litigation to declare a proverbial winner in the parties’ war of the battling experts or dueling statistics and chemical concentrations.... This type of determination would require the Court to weigh the evidence presented and engage in a Daubert style critique of the proffered experts qualifications, which would be inappropriate.... At this stage of the litigation, therefore an inquiry into the admissibility of Plaintiffs’ proposed expert testimony as set forth in Daubert would be inappropriate, because such an analysis delves too far into the merits of Plaintiffs’ case.
Sher, 419 Fed.Appx. at 889, 2011 WL 814379, at *2 (second and third alterations in original) (quoting the district court). The Eleventh Circuit reversed:
The American Honda court found that, if the situation warrants, the district court must perform a full Daubert analysis before certifying the class. “A district court is the gatekeeper. It must determine the reliability of the expert’s experience and training as well as the methodology used. The [district] court must also resolve any challenge to the reliability of information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification.” We agree.
Id., 419 Fed.Appx. at 890, 2011 WL 814379, at *3 (alteration in original) (internal citations omitted) (quoting Am. Honda, 600 F.3d at 815-16). The Eleventh Circuit went on to hold that the “district court erred as a matter of law by not sufficiently evaluating and weighing conflicting expert testimony on class certification. It was error for the district court to decline to declare a proverbial, yet tentative winner. The Plaintiffs are required to prove, at the class certification stage, more than just a prima facie case, i.e., more than just a ‘pretty good case.’ ” Id. (internal citations omitted).
If I were to reach the issue, I would join the Seventh and Eleventh Circuits and resolve this open question in our circuit by requiring district courts to conduct a full Daubert analysis before certifying a class whenever an expert’s opinion is central to class certification and the reliability of that opinion is challenged. I reach this conclusion for.a number of reasons. First, the 2003 amendments to Rule 23 removed the provision that class certification “may be conditional.” See Miles, 471 F.3d at 39; Fed.R.Civ.P. 23(c)(1)(C). Requiring a full Daubert analysis is a natural extension of the concept that class certification should not be conditional and should be permitted only after a rigorous application of Rule 23’s requirements. See Wal-Mart Stores, 564 U.S.-, 131 S.Ct. at 2550-54; Miles, 471 F.3d at 39-41.
Second, I find it counterintuitive to allow district courts to utilize inadmissible expert testimony to resolve factual disputes at the class certification stage. In Blades, we held that:
The preliminary inquiry at the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case. Nonetheless, such disputes may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiffs general allegations were true, to make out a prima facie case for the class. The closer any dispute at the class certification stage comes to the heart of the claim, the more cautious the court should be in ensuring that it must be resolved in order to determine the nature of the evidence the plaintiff would require.
*629 Blades, 400 F.3d at 567 (internal citations omitted). The purpose of conducting a Daubert inquiry is to ensure the relevance and reliability of expert testimony. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir.2001). “It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). These principles are equally applicable in the context of class certification. See Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 639 (9th Cir. 2010) (Ikuta, J., dissenting), rev’d, 564 U.S. -, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). The district court must “assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit.” Miles, 471 F.3d at 42; see also In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 323 (“Expert opinion with respect to class certification, like any matter relevant to a Rule 23 requirement, calls for rigorous analysis.”).
Just as in American Honda, the district court’s statement in the instant case as to the admissibility of Staehle and Blischke’s testimony and reports “is not even conclusory; it leaves open the questions of what portions of [the experts’] testimony it may have decided (or will decide) to exclude.” Am. Honda, 600 F.3d at 816 (holding that the district court’s refusal to conclusively determine, before certifying a class, whether the “expert report was reliable enough to support Plaintiffs’ class certification request” was an abuse of discretion). “Like any other evidence, expert evidence introduced to ‘establish a component of a Rule 23 requirement’ must be reliable; it is not enough that the expert testimony is ‘not fatally flawed.’ ” Dukes, 603 F.3d at 639 (Ikuta, J., dissenting) (quoting Miles, 471 F.3d at 42); see also Pecover v. Elec. Arts Inc., No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632, at *8 (N.D.Cal. Dec. 21, 2010) (“Given that class actions consume vast judicial resources and that many defendants face substantial settlement pressures as a result of class certification, ... it hardly seems appropriate to allow flimsy expert opinions to buttress plaintiffs’ [Rule] 23 arguments.... [A] Daubert analysis of every challenged expert opinion seems prudent in fulfilling the court’s obligation to ensure actual conformance with [Rule] 23....”).
Plaintiffs advance two reasons why this court should not adopt the American Honda standard. First, plaintiffs argue that mandating a full Daubert analysis at the class certification stage “would render the ‘early practicable time’ language of Rule 23 virtually meaningless” and “would ignore limitations of the information available to the experts created by ... bifurcated discovery.” However, because class certifications are no longer conditional, a district court should delay certifying a class until it is satisfied that all Rule 23 requirements have been met, even if additional targeted discovery is needed to assess the reliability of an expert’s opinions. Importantly, requiring a district court to conduct a full Daubert analysis before certifying a class discourages plaintiffs who may have no intention of proceeding to a trial on the merits from submitting unreliable expert testimony for settlement purposes. See Schleicher v. Wendt, 618 F.3d 679, 682-83 (7th Cir.2010) (noting that “certification substantially increases the settlement value” of suits); Wal-Mart Stores, Inc. v. Visa U.S.A. Inc. (In re Visa *630 Check/MasterMoney Antitrust Litig.), 280 F.3d 124, 145 (2d Cir.2001) (“The effect of certification on parties’ leverage in settlement negotiations is a fact of life.”), overruled on other grounds by Miles, 471 F.3d 24; Szabo, 249 F.3d at 675 (noting that class certification “puts a bet-your-company decision to [defendant’s] managers and may induce a substantial settlement even if the customers’ position is weak”).
Second, plaintiffs argue that mandating a full Daubert analysis at the class certification stage “is also unnecessary because expert opinions at class certification are considered by an Article III judge” and not by a jury. The court agrees with this position. Ante at 613. I believe, however, that this argument misses the mark. Our concern should not be that the district judge cannot weigh admissible expert testimony properly. We should be concerned, instead, that the case will proceed beyond class certification on the basis of inadmissible, unreliable expert testimony. “[E]xpert testimony that is not scientifically reliable should not be admitted, even ‘at this early stage of the proceedings.’ ” Am. Honda, 600 F.3d at 819 (internal quotation marks omitted).
As such, were I to reach this question in the instant case, I would reverse the district court’s decision to certify the breach of warranty class and the negligence class and remand the case to the district court to conduct a full Daubert inquiry as to the admissibility of Staehle and Blischke’s testimony.[11]
II. CONCLUSION
Because I would conclude that the dry plaintiffs have failed to allege an injury in fact and, therefore, lack standing, and because individual issues predominate over common issues for those plaintiffs remaining in the breach of warranty class, I would reverse the district court’s certification of the breach of warranty class. Because I would conclude that individual issues predominate over common issues for those plaintiffs in the negligence class, I would reverse the district court’s certification of the negligence class as well. Thus, I respectfully dissent.

. Allowing plaintiffs who own properly functioning Zurn fittings to sue under the benefit of the bargain theory is not only economically inefficient but also could result in double recovery. See In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 288 F.3d 1012, 1017 (7th Cir.2002) ("Plaintiffs describe the injury as financial rather than physical and seek to move the suit out of the tort domain and into that of contract (the vehicle was not the flawless one described and thus is not merchantable, a warranty theory).... It is not clear that this maneuver actually moves the locus from tort to contract. If tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly mean excess compensation."). In Bridgestone/Firestone, Judge Easterbrook provided an apt illustration of why a mixed system of recovery in both contract and tort leads to inefficient outcomes:
Consider an example. Defendant sells 1,000 widgets for $10,000 apiece. If 1% of the widgets fail as the result of an avoidable defect, and each injury creates a loss of $50,000, then the group will experience 10 failures, and the injured buyers will be entitled to $500,000 in tort damages. That is full compensation for the entire loss; a manufacturer should not spend more than $500,000 to make the widgets safer. Suppose, however, that uninjured buyers could collect damages on the theory that the risk of failure made each widget less valuable; had they known of the risk of injury, these buyers contend, they would have paid only $9,500 per widget — for the expected per-widget cost of injury is $500, and each buyer could have used the difference in price to purchase insurance (or to self-insure, bearing the risk in exchange for the lower price). On this theory the 990 uninjured buyers would collect a total of $495,000. The manufacturer's full outlay of $995,000 ($500,000 to the 10 injured buyers + $495,000 to the 990 uninjured *624 buyers) would be nearly double the total loss created by the product’s defect. This would both overcompensate buyers as a class and induce manufacturers to spend inefficiently much to reduce the risks of defects. A consistent system — $500 in damages to every buyer, or $50,000 in damages to every injured buyer — creates both the right compensation and the right incentives. A mixed system overcompensates buyers and leads to excess precautions.
Id. at 1017 n. 1 (internal citations omitted).

. While the court in Blades employed this language, Blades, 400 F.3d at 566, it went on to require that a district court conduct a rigorous analysis that "may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case," id. at 567. Since our decision in Blades, our court has continued to emphasize that district courts must "undertake a 'rigorous analysis’ that includes examination of what the parties would be required to prove at trial.” Avritt, 615 F.3d at 1029 (quoting Elizabeth M., 458 F.3d at 786). Engaging in such a rigorous analysis comports with my view that "[t]he proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it.” Szabo, 249 F.3d at 675; accord In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 318 (3d Cir. 2008); Brown v. Am. Honda (In re New Motor Vehicles Can. Export Antitrust Litig.), 522 F.3d 6, 26 (1st Cir.2008); Miles, 471 F.3d at 33, 41-42; Unger v. Amedisys Inc., 401 F.3d 316, 321-22 (5th Cir.2005); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004).

. Such a full Daubert analysis would have been particularly apt in this case as the district court relied on the questionable expert testimony of Dr. Blischke when it certified the breach of warranty class. According to the district court, Dr. Blischke “concluded that the fittings have a mean time to failure of 40 years, which means approximately half of the units will likely fail within 40 years and approximately half will fail after.” In re Zurn Pex Plumbing, 267 F.R.D. at 556. However, this statement is troublesome in two respects. First, Dr. Blischke did not conclude that the fittings have a mean time to failure of 40 years; he assumed an average mean-time-to-failure rate of 40 years — a number derived from a Zurn erosion test that showed that its fittings did not display any erosion after 40 years. Second, Dr. Blischke’s assumption is unreliable on its face: while no fitting failed in the Zum test after 40 years' worth of water had passed through it, Dr. Blischke assumed that half of the fittings will fail within 40 years.