# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2267

_____

| | | |
|---|---|---|
| In re: Zurn Pex Plumbing Products Liability Litigation<br>_____ | * * * * | |
| Denise Cox; Terry Cox; Kevin Haugen; Christa Haugen; Robert Hvezda; Carrie Hvezda; Jody Minnerath; Brian Minnerath; Michelle Oelfke, on behalf of themselves and all others similarly situated, | * * * * * * | Appeal from the United States District Court for the District of Minnesota. |
| Plaintiffs - Appellees, | * * | |
| v. | * * | |
| Zurn Pex, Inc.; Zurn Industries, Inc., | * * | |
| Defendants - Appellants.<br>_____ | * * * | |
| American Association for Justice, | * * | |
| Amicus Curiae. | * | |

_____

Submitted: March 16, 2011
Filed: July 6, 2011

_____

Before WOLLMAN, MURPHY, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

Minnesota homeowners brought this action[1] against Zurn Pex, Inc. and Zurn Industries, Inc (Zurn) alleging that brass fittings used in the company's cross linked polyethylene (PEX) plumbing systems are inherently defective. In pretrial motions the homeowners sought class certification for their consumer protection, warranty, and negligence claims, and Zurn moved to strike the testimony of two of the homeowners' experts. After denying Zurn's motion to strike the expert testimony, the district court[2] granted the homeowner requests for class certification for their warranty and negligence claims, but denied it for their consumer protection claims. Zurn appeals from the district court's certification order. We affirm.

I.

Zurn manufactures and markets a home plumbing system that uses PEX tubing, an alternative to traditional copper water pipes. PEX tubing systems are marketed as easier to install, cheaper, and longer lasting than copper plumbing systems. The Zurn PEX systems have been installed in homes throughout the United States. Zurn has sold its PEX systems with a 25 year limited warranty.

In the plumbing systems at issue in this case, PEX tubes are joined together using a brass fitting and crimp. A tube is placed around a fitting, the crimp is tightened around the outside of the tube, and the resulting pressure creates a seal between the tube and the fitting. The homeowners allege that the brass fittings used

---

[1]This action only involves claims by Minnesota homeowners. Claims filed by plaintiffs in other states have also been consolidated in the District of Minnesota for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. See 28 U.S.C. § 1407.

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

in these systems are "doomed to leak within warranty" because of their susceptibility to stress corrosion cracking (SCC) which results from a combination of pressure and corrosion. The homeowners argue that SCC inevitably begins to affect Zurn's brass fittings upon their installation and exposure to water. The SCC increases over time and the fitting eventually begins to leak, causing costly water damage to homes. Zurn argues that SCC is not an inherent defect and that it is instead caused by a variety of factors which include improper installation and overly corrosive water. Some of the homeowner plumbing systems have leaked, but others have not.

The parties disagreed about pretrial discovery. The homeowners sought a single phase discovery plan, but Zurn suggested bifurcated discovery. The district court adopted Zurn's approach and ordered that the first phase of discovery address the limited question of class certification. At the close of the first phase of discovery, the homeowners moved for class certification. Zurn opposed it and moved to strike testimony from two of the homeowners' experts, Dr. Roger W. Staehle and Dr. Wallace R. Blischke.

Dr. Staehle is the former Dean of the University of Minnesota Institute of Technology. He has been researching and publishing articles on SCC for over 40 years. Dr. Staehle examined Zurn brass fittings, including some which had leaked as well as some which were new. He conducted a battery of tests on the fittings. His tests included scanning electron microscopy, electron dispersive spectroscopy, auger electron dispersive spectroscopy, microhardness testing, materials analysis, water chemistry analysis, and static load testing. He also performed a "U-bend" experiment where metal samples from the fittings were bent into a U shape and then tested to determine their susceptibility to SCC. Dr. Staehle subjected these samples to strain, immersed them in different water solutions, and then checked them after two, four, and six months. He concluded that his experiments showed that "rapid SCC would occur" in Zurn's brass fittings.

Based on his knowledge about SCC and his numerous tests, Dr. Staehle concluded that "[t]he failure process in Zurn fittings starts as soon as they are exposed to domestic water," "[s]ignificant numbers of leak-causing failures appear to occur in as little as a single year," and "[t]here is no evidence . . . that the Zurn fittings can perform reliably for 25 years . . . nor are there any bases for a much longer design life of about 40 years." Dr. Staehle attributed the poor performance of the fittings to choice of materials and to poor manufacturing. He rejected the theory that the SCC in Zurn's fittings was caused by unusually corrosive water or improper installations.

Dr. Blischke is a statistician and Professor Emeritus at the University of Southern California. He has written a number of books on product reliability and warranties. Dr. Blischke undertook a study of Zurn PEX plumbing systems and analyzed the failure rate of those systems with Zurn's brass fittings. He grounded his analysis on the available warranty data obtained from Zurn. Since he found that data incomplete, he was required to make assumptions about the "mean time to failure" experienced by the brass fittings.

Based on witness testimony and documents indicating that Zurn considered 40 years to be the average lifetime of its PEX systems, Dr. Blischke assumed a mean time to failure of 40 years. Using that figure and assuming that the average household installation contained 50 brass fittings, he calculated that 99% of homes would experience a leak in at least one of the fittings within 25 years. Dr. Blischke also conducted the same analysis based on alternate mean time to failure figures of 50, 60, and 100 years. The system failure rates remained high even when the longer mean time to failure figures were projected.

The parties disagreed about the appropriate application of Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), at the class certification stage. The homeowners urged that expert testimony should only be excluded at this stage if it were "so flawed it cannot provide any information as to whether the requisites of class

certification have been met." Zurn argued, however, that the district court should conduct a full and conclusive <u>Daubert</u> inquiry before certifying a class.

The district court charted a middle course between the positions urged by the parties. After reviewing the evidence that had been produced, the court concluded that a full and conclusive <u>Daubert</u> inquiry would not be necessary or productive at this stage of the litigation, particularly since the expert opinions could change during continued discovery. The court instead conducted a focused <u>Daubert</u> inquiry to assess whether the opinions of Dr. Staehle and Dr. Blischke, based on their areas of expertise and the reliability of their analyses of the available evidence, should be considered in deciding the issues relating to class certification.

After conducting its focused <u>Daubert</u> inquiry, the district court denied Zurn's motions to strike the testimony of the experts. The court made clear, however, that its rulings were not final and that its view of the issues might change as discovery continued and additional evidence was produced.

The district court then turned to the question of class certification under Fed. R. Civ. P. 23. The homeowner claims fell into three broad categories: consumer protection, breach of warranty, and negligence. For each claim, the homeowners moved to certify the following class:

> All persons and entities that own a structure located within the State of Minnesota that contains a Zurn Pex plumbing system with Zurn[3] brass crimp fittings. The proposed class includes, without limitation, all such persons or entities who contacted Zurn or its representatives about their Zurn Pex plumbing system and were denied or partially denied warranty

---

[3]The district court amended the class definition proposed by the homeowners by adding the word "Zurn" to clarify that members of the class must have a plumbing system with Zurn brass crimp fittings.

coverage for failure of the Zurn Pex plumbing system based on a claim that "corrosion" was not covered by the warranty or that other alleged warranty limitations applied.

This definition was used by the district court to analyze the Rule 23 class certification requirements with respect to the three categories of homeowner claims. It focused on what it termed the "core dispute between the parties" which arose out of Rule 23(b)(3)'s requirement that questions of law or fact common to the class predominate over individual questions. The court first determined that the issue of individual reliance in respect to the consumer protection claims was not amenable to class wide resolution. It refused to certify a class for those claims, and no one has appealed that decision. The court next addressed the warranty claims, determined that common questions predominate as to them, and certified a class of warranty claimants. Finally, the court certified a limited class for the negligence claims. It limited the scope of that class to those members who had already "suffered damage to their property," that is those who already had suffered an injury recognized in tort.

Zurn brings this Rule 23(f) interlocutory appeal of the order issued by the district court certifying the warranty and negligence classes. Zurn argues that the district court should have excluded the expert opinions of Dr. Staehle and Dr. Blischke and that it erred in declining to conduct what it calls a full and conclusive <u>Daubert</u> inquiry before certification. Zurn further contends that the district court applied the wrong standard and abused its discretion in certifying the warranty and negligence classes and erred by including persons in the warranty class whose plumbing systems had not yet leaked.

II.

Rule 23(c)(1)(A) provides that a district court should address class certification at an "early practicable time after a person sues or is sued as a class representative."

-6-

When deciding whether common issues predominate over individual issues under Rule 23(b)(3), the court should conduct a "rigorous analysis" including an "examination of what the parties would be required to prove at trial." Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1029 (8th Cir. 2010). Expert disputes "concerning the factual setting of the case" should be resolved at the class certification stage only to the extent "necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." Blades v. Monsanto Co., 400 F.3d 562, 567 (8th Cir. 2005). We have never required a district court to decide conclusively at the class certification stage what evidence will ultimately be admissible at trial.

Here, both sides agree that the relevant expert testimony must be evaluated and weighed by the court before it decides to certify a class. Zurn urges that we adopt a new rule, requiring a district court to determine conclusively at an early stage, not just whether or not expert evidence is sufficient to support class certification under Rule 23, but also whether that evidence will ultimately be admissible at trial. It urges us to follow the approach used by a Seventh Circuit panel in American Honda Motor Company, Inc. v. Allen, 600 F.3d 813, 816–17 (7th Cir. 2010) (per curiam).

The plaintiffs in American Honda sought to certify a class of motorcycle owners based on an alleged design defect affecting their motorcycles. The plaintiffs relied on an expert who had created his own methodology and standards which he then tested on a single used motorcycle. These tests had been developed only "to assist with a lawsuit and [were] not conceived through the logical flow of independent research," had a "sample size of one," and "lack[ed] acceptance" by the scientific community. Id. at 816. The Seventh Circuit panel was thus dealing with a case with

expert conclusions based on flawed methodology and a sample size of one when it stated its preference for an early full and conclusive <u>Daubert</u> review.[4]

The record in the case before us is very different from the one in <u>American Honda</u>. No party in this case has alleged that the expert testimony here is similarly flawed. Both sides agree that Dr. Staehle and Dr. Blischke are well qualified in their respective fields and that they used generally recognized and reliable methodologies. Zurn nonetheless contends that the district court should determine at the class certification stage, and before merits discovery has even commenced, whether or not the expert opinions will ultimately be admitted <u>at trial</u>.

Our own circuit precedent does not favor the approach urged by Zurn. In <u>Blades</u>, we approved a district court decision which explicitly rejected a request for a full <u>Daubert</u> inquiry at the class certification stage. 400 F.3d at 569. We affirmed, concluding that the district court's "findings as to the experts' disputes were properly limited to whether, if appellants' basic allegations were true, common evidence could suffice, given the factual setting of the case, to show classwide injury." <u>Id.</u> at 575. In declining to conduct what Zu rn terms a full and conclusive <u>Daubert</u> inquiry, the district court in <u>Blades</u> properly focused on "determin[ing] the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class." <u>Id.</u> at 567.

---

[4]It appears no other circuit has followed the approach advocated in <u>American Honda</u>, and at least one court sitting en banc has rejected it. <u>See</u> <u>Dukes v. Wal-Mart Stores, Inc.</u>, 603 F.3d 571, 602 n.22 (9th Cir. 2010) (en banc), <u>rev'd on other grounds</u>, 564 U.S. —, 2011 WL 2437013 (Jun. 20, 2011). While an Eleventh Circuit panel mentioned the case in a recent unpublished opinion, the issue in that case was the <u>weight</u> afforded to certain expert testimony, not its admissibility. <u>Sher v. Raytheon</u>, No. 09-15798, 2011 WL 814379 at *3 (11th Cir. Mar. 9, 2011) (unpublished).

In this case, the district court followed <u>Blades</u> by applying what it termed a "tailored" <u>Daubert</u> analysis. Rejecting both parties' extreme positions, it examined the reliability of the expert opinions in light of the available evidence and the purpose for which they were offered.[5]  We can hardly fault the trial court for following our precedent in <u>Blades,</u> and we see no reason to abandon the "cardinal rule . . . that one panel is bound by the decision of a prior panel." <u>Owsley v. Luebbers</u>, 281 F.3d 687, 690 (8th Cir. 2002).  Moreover, we are not convinced that the approach of <u>American Honda</u> would be the most workable in complex litigation or that it would serve case management better than the one followed by the district court here.

The district court sought to examine the reliability of the expert testimony in light of the existing state of the evidence and with Rule 23's requirements in mind. The record in this case illustrates why that approach was appropriate and why requiring an even more conclusive <u>Daubert</u> inquiry at the class certification stage would have been impractical.  As the district court noted with respect to Dr. Blischke:

> Dr. Blischke's analysis was circumscribed by the availability of warranty claims data.  However, as merits discovery unfolds and more information becomes available, Dr. Blischke's 40 year estimate for the mean time to failure may or may not be admissible.

It was after all Zurn which sought bifurcated discovery which resulted in a limited record at the class certification stage, preventing the kind of full and conclusive <u>Daubert</u> inquiry Zurn later requested.  While there is little doubt that bifurcated discovery may increase efficiency in a complex case such as this, it also means there

---

[5]The dissent notes that the Supreme Court recently "doubt[ed]" a district court's conclusion that "<u>Daubert</u> did not apply to expert testimony at the certification stage of class-action proceedings." <u>Wal-Mart v. Dukes</u>, 2011 WL 2437013, at *8.  The district court here made no such conclusion.  It rejected the homeowner contention that it should consider all evidence that was "not fatally flawed" and proceeded to apply <u>Daubert</u> by conducting a focused inquiry into expert reliability in light of the available evidence.

may be gaps in the available evidence. Expert opinions may have to adapt as such gaps are filled by merits discovery, and the district court will be able to reexamine its evidentiary rulings. See Walzer v. St. Joseph State Hosp., 231 F.3d 1108, 1113 (8th Cir. 2000) ("Evidentiary rulings made by a trial court during motions in limine are preliminary . . . ."). A court's rulings on class certification issues may also evolve. See Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

Class certification "is inherently tentative," Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 n.11 (1978), and may "require revisiting upon completion of full discovery," Blades, 400 F.3d at 567. Zurn's desire for an exhaustive and conclusive Daubert inquiry before the completion of merits discovery cannot be reconciled with the inherently preliminary nature of pretrial evidentiary and class certification rulings.

The main purpose of Daubert exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker. The district court's "gatekeeping function" under Daubert ensures that expert evidence "submitted to the jury" is sufficiently relevant and reliable, Bonner v. ISP Technologies, Inc., 259 F.3d 924, 929 (8th Cir. 2001) (emphasis added), but "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself," United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005). Similar reasons support less stringent application of Daubert in bench trials. See Charles Alan Wright, Victor James Gold, 29 Fed. Prac. & Proc. Evid. § 6266, n.90.2 (2010), and cases cited. The "usual concerns of the [Daubert] rule— keeping unreliable expert testimony from the jury—are not present in such a setting." Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 760 (7th Cir. 2010).

Zurn correctly points out that we require district courts to rely only on admissible evidence at the summary judgment stage, see Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 924 (8th Cir. 2004), but the questions then are quite different than

at the class certification stage. Because summary judgment ends litigation without a trial, the court must review the evidence in light of what would be admissible before either the court or jury. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In contrast, a court's inquiry on a motion for class certification is "tentative," "preliminary," and "limited." Coopers & Lybrand, 437 U.S. at 469 n.11; Blades, 400 F.3d at 566. The court must determine only if "questions of law or fact common to class members predominate over any questions affecting only individual members [and if] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As class certification decisions are generally made before the close of merits discovery, the court's analysis is necessarily prospective and subject to change, Blades, 400 F.3d at 567, and there is bound to be some evidentiary uncertainty. Because a decision to certify a class is far from a conclusive judgment on the merits of the case, it is "of necessity . . . not accompanied by the traditional rules and procedure applicable to civil trials." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974).

We conclude that the district court did not err by conducting a focused Daubert analysis which scrutinized the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence. In doing so the district court conducted the requisite "rigorous analysis" of the parties' claims to determine "whether the defendant's liability to all plaintiffs may be established with common evidence." Avritt, 615 F.3d at 1029.

III.

After concluding its tailored Daubert analysis, the district court denied Zurn's motion to strike the opinions offered by Dr. Staehle and Dr. Blischke. On its appeal Zurn does not dispute either of the expert's qualifications or methodology. Their reputations as eminent experts in their respective fields are not in question. Rather,

-11-

Zurn argues that their opinions were not based on "sufficient facts or data" and should therefore have been stricken.

Having already concluded that the district court applied the correct legal standard in declining to strike the expert opinions, we will reverse those evidentiary rulings only upon a showing that it abused its discretion in a way which "affected a party's substantial rights." Weitz Co. v. MH Washington, 631 F.3d 510, 525 (8th Cir. 2011). We also keep in mind that, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." Bonner, 259 F.3d at 929 (quoting Hose v. Chicago Nw. Transp. Co., 70 F.3d 968, 974 (8th Cir. 1996)). Such testimony should be excluded only if it "is so fundamentally unsupported that it can offer no assistance to the jury." Id. at 929–30.

According to Zurn, Dr. Staehle applied an unrealistic amount of strain in his "U-bend" testing which affected his overall conclusion that its brass fittings invariably would experience SCC. In the view of Zurn's expert, Dr. Staehle's decision to apply a 20% strain in testing brass specimens was unreasonable because the actual strain on properly installed brass fittings was lower. The homeowners respond that the 20% strain was reasonable in the context of Dr. Staehle's experiments. Moreover, they argue that any disagreement over the appropriate strain level only affects the weight of the evidence, not its admissibility.

The issue here is similar to one addressed in Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1344 (11th Cir. 2003). There, an expert used a reliable method (computational fluid dynamics), but the parties disputed whether the expert "put the wrong information" into a computer program that he used to compute his results. Id. at 1343–44. The circuit court determined that when parties dispute "the specific numbers" to be used in an otherwise reliable scientific analysis, the "alleged flaws . . . are of a character that impugn the accuracy of [the expert's] results, not the general scientific reliability of his methods." Id. at 1345. The district court had therefore not abused its discretion by declining to exclude the expert's evidence

-12-

under Daubert. Id. at 1346. Objections to generally reliable scientific evidence go to its weight, not its admissibility. See id. at 1345–46, and cases cited.

The validity of one of Dr. Staehle's inputs was also challenged by Zurn. The district court concluded that the question of the proper strain to be applied in the U-bend tests went to "the accuracy of Dr. Staehle's results, [but] not the general scientific validity of his methods." As the Supreme Court pointed out in Daubert, when evaluating an expert's opinion, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595. A district court necessarily has "considerable discretion" in deciding whether to admit expert testimony where the factual basis is disputed. Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 401 F.3d 901, 916 (8th Cir. 2005). We conclude that the district court did not abuse its discretion in declining to strike Dr. Staehle's testimony.

Zurn's main attack on Dr. Blischke's testimony about system failure rates is that he assumed a mean time to failure figure rather than attempting to calculate that figure from available data. Dr. Blischke explained that it was necessary to assume a mean time to failure figure because he lacked reliable warranty data from Zurn. He pointed to Zurn's inadequate record keeping and evidence that many of its customers had stopped reporting leaks after Zurn began to reject warranty claims. Zurn does not directly dispute Dr. Blischke's position that it is generally acceptable to include a reasonable assumption in a statistical analysis when there is insufficient data to calculate a particular value.

Because Dr. Blischke's assumed mean time to failure figure was not unsupported, the district court did not abuse its discretion in declining to exclude his opinion. Dr. Blischke testified that he adopted a 40 year mean time to failure figure after examining a report in which Zurn itself referred to 40 years as "a normal lifetime" for its fittings. He also stated that he relied on reports prepared by other expert witnesses in this case. For example, in Dr. Staehle's expert opinion there was "no evidence . . . that the Zurn fittings can perform reliably for 25 years . . . nor are

-13-

there any bases for a much longer design life of about 40 years." Dr. Blischke also provided additional calculations based on longer mean time to failure figures, up to 100 years, and those figures still showed high failure rates within 25 years.

Zurn claims that there were other weaknesses in Dr. Blischke's approach. It faults his assumptions that brass fittings would fail randomly and in different households and that an average household would have 50 fittings. The record shows that Dr. Blischke actually considered a range of variables in his analyses, just as he did when considering mean time to failure figures. He provided failure rates, for example, based on 40, 50, 60, and 100 fittings per household system. This approach was reasonable, for Dr. Blischke's expertise is in statistics and reliability, not plumbing or metallurgy. His testimony can help a fact finder understand the implications of opinions offered by other experts such as Dr. Staehle. If a factfinder doubts Dr. Blischke's assumptions, then the factfinder will discount his ultimate conclusions or rely on his alternate calculations which account for different values. Such possibilities do not diminish the validity of Dr. Blishcke's scientific methods. An expert's opinions are not inadmissable simply because an underlying assumption may be contestable. Marvin Lumber, 401 F.3d at 916.

The district court indicated that it was aware of certain limitations in Dr. Blischke's analysis and that it had given his evidence its "proper weight." It also noted that as additional evidence is uncovered during discovery, "Dr. Blischke's 40 year estimate for the mean time to failure may or may not be admissible." There is nothing in the record at this stage to show that Dr. Blischke's opinions are so "fundamentally unsupported" as to require exclusion. See Bonner, 259 F.3d at 929–30.

We conclude that the district court did not err or abuse its discretion in denying Zurn's motion to strike the homeowners' expert testimony.

IV.

Zurn argues that some members of the warranty class lacked standing to bring their claims and that the district court therefore erred by certifying that class. We ordinarily afford the district court "broad discretion in determining whether to certify a class," Arthur Young & Co. v. Reves, 937 F.2d 1310, 1323 (8th Cir. 1991), recognizing "the essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation," Gene & Gene LLC v. BioPay LLC, 541 F.3d 318, 325 (5th Cir. 2008). While we reverse only for an abuse of that discretion, a district court "abuses its discretion if it commits an error of law." Blades, 400 F.3d at 566.

A district court may not certify a class, however, "if it contains members who lack standing." Avritt, 615 F.3d at 1034. If members "who lack the ability to bring a suit themselves" are included in a class, the court lacks jurisdiction over their claims, see id., and we therefore review Zurn's standing challenge de novo, see, e.g., Curtis Lumber Co., Inc. v. Louisiana Pac. Corp., 618 F.3d 762, 770 (8th Cir. 2010). To show standing, a plaintiff bears the burden of establishing "injury in fact . . . that is fairly traceable to the challenged action of the defendant, and likely [to] be redressed by a favorable decision." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009). In most cases "the question whether [a plaintiff] has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief." Id.

In asserting a warranty claim, it "is not enough" for a plaintiff "to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect." O'Neil v. Simplicity, Inc., 574 F.3d 501, 503 (8th Cir. 2009). In O'Neil, for example, crib owners failed to state cognizable warranty claims because they had not alleged that their cribs actually exhibited a dangerous defect that might have harmed

their children; a mere likelihood that a crib might develop a dangerous defect was not enough. Id. at 503–04.

Zurn argues that those plaintiffs whose plumbing systems have not leaked—a group most accurately referred to as the "dry plaintiffs"[6]—have no standing because they, like the crib owners in O'Neil, have not suffered a cognizable injury. The homeowners respond that the district court correctly determined that the dry plaintiffs have alleged a current harm because they allege that the Zurn brass fitting contained a defect upon installation in breach of Minnesota warranty law. See Minn. Stat. §§ 336.2-313 & 2-314.

Pointing to several words in the class certification order, Zurn argues that the district court did not follow our rule that a manifestation of a defect is required for a warranty claim. See O'Neil, 574 F.3d at 503. At one point the district court commented that the homeowners were "not required to allege and prove a manifestation of [a] defect." It had however stated in its previous sentence that the homeowners had to "prove that the brass fittings are defective" in order to recover in warranty. When the sentences are read together, it is clear that the court's position was that to give rise to a warranty claim a fitting must contain a defect, but that it need not have already caused external damage. This position was consistent with O'Neil even if there was some lack of precision in the district court's statement of the applicable standard. O'Neil never indicated that a child would have to be injured by a crib for a defect to be manifest.

The dry plaintiff claims are distinct from any brought by hypothetical "no injury plaintiffs," because the dry plaintiffs had alleged that their brass fittings exhibited a

[6]While Zurn refers to these class members as "no injury" plaintiffs, that label presumes a negative answer to a contested question—whether or not these plaintiffs have suffered a legally cognizable injury. This group is thus more appropriately referred to as the "dry plaintiffs."

defect. In contrast to the plaintiffs in <u>O'Neil</u>, the homeowners do not argue that the fittings merely "risk" developing SCC. They allege that SCC afflicts all of the fittings upon use, regardless of water conditions or installation practices. As they have put it, SCC "is already manifest in all systems." They supported this contention with expert testimony. Dr. Staehle opined, for example, that SCC develops in "Zurn fittings . . . as soon as they are exposed to domestic water." Given this evidence, the district court did not err in determining that the dry plaintiffs were not "no injury" parties simply because their plumbing systems had not yet leaked.

We conclude that the district court did not err in concluding that the claims of the dry plaintiffs are cognizable under Minnesota warranty law and that they may seek damages if they succeed in proving their claim of a universal inherent defect in breach of warranty. <u>See</u> Minn. Stat. § 336.2-714; <u>Peterson v. Bendix Home Sys., Inc.</u>, 318 N.W. 2d 50, 53 (Minn. 1982) (explaining damages available for breach of warranty under the Minnesota UCC). The dry plaintiffs therefore had standing to bring their claims, and the district court did not err in certifying a class which included them.

Zurn further contends that the district court abused its discretion in granting class certification to the dry plaintiff claims before interpreting the terms of the company's limited warranty. It argues that its warranty bars a claim unless a fitting has already leaked. In support Zurn cites its own statement disclaiming implied warranties along with the following sentence: "Under this warranty, you only have a right to reimbursement if the <u>alleged failure or leak</u> is determined to be a direct result of the product(s) as covered in this warranty and occurred during the warranty period" (emphasis added). The homeowners respond that SCC is a failure covered by the warranty.

The interpretation of Zurn's warranty and its application to all of the dry plaintiffs is a common question that lends itself to efficient class wide resolution under Rule 23. <u>Pella Corp. v. Saltzman</u>, 606 F.3d 391, 394 (7th Cir. 2010); <u>see also</u> <u>Wolin v. Jaguar Land Rover N. Am., LLC</u>, 617 F.3d 1168, 1173–74 (9th Cir. 2010);

Daffin v. Ford Motor Co., 458 F.3d 549, 553–54 (6th Cir. 2006). While disputes about Rule 23 criteria may overlap with questions going to the merits of the case, the district court should not resolve the merits of the case at class certification. Blades, 400 F.3d at 567. If, at a later date, the court were to conclude that the dry plaintiff claims are indeed barred by Zurn's limited warranty, it may decertify the class or amend the class definition, see Fed R. Civ. P. 23(c)(1)(C); Daffin, 458 F.3d at 554, or grant summary judgment to Zurn on such claims under Rule 56. For these reasons we find no abuse of discretion in the district court's decision to certify a warranty class including these plaintiffs.

V.

Zurn also argues that the district court erred by certifying the warranty and negligence classes because their common questions do not predominate over individual questions. See Fed. R. Civ. P. 23(b)(3). We review the district court's rulings on issues of law de novo and its application of the law for an abuse of discretion. Blades, 400 F.3d at 566.

Rule 23(b)(3)'s requirement that common issues of fact or law must predominate over individual questions "tests whether proposed class members are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997). Individual issues are those which require "evidence that varies from member to member" to make a prima facie showing. Blades, 400 F.3d at 566. Common questions are those for which a prima facie case can be established through common evidence. Id. When determining "whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings," but that inquiry should be limited to determining whether, if the plaintiffs' "general allegations are true, common evidence could suffice to make out a prima facie case for the class." Id. While limited in scope, this analysis should also be "rigorous." Avritt, 615 F.3d at 1029.

-18-

Zurn complains about the district court's mention of taking "the substantive allegations in the plaintiff's complaint as true" while considering a motion for class certification. Zurn contends that this premise "permeates all of the district court's findings and conclusions" and cannot be reconciled with the requirement that it conduct a "rigorous inquiry" into whether liability "may be established with common evidence." See Avritt, 615 F.3d at 1029. The homeowners respond first by pointing out that the district court recognized the requirement for it to conduct a rigorous analysis in the same paragraph containing the language criticized by Zurn. The court clearly stated that it would granted class certification "[o]nly after a rigorous analysis of the proposed class and the requirements of Rule 23," citing General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 161 (1982). The homeowners further emphasize that the rigor of the court's analysis is shown by the facts that it rejected certification as to some of their claims and modified the scope of the class as to others.

Our review of the record and the district court's certification order indicates that it conducted a rigorous inquiry to decide whether "common evidence could suffice to make out a prima facie case for the class." Blades, 400 F.3d at 566. The court did not simply take as true all of the homeowner allegations. In addition to scrutinizing the testimony of the parties' expert witnesses, the court carefully examined the homeowner claims along with Zurn's defenses. In considering the homeowner request for class certification of their consumer protection claims, for example, it weighed and rejected their contention that they could prove by common evidence that all consumers "failed to receive the same material omission" of information "essential in making the decision to purchase" Zurn's product.

A comparison of the consumer protection claims with the warranty and negligence claims is instructive. As we explained in In re St. Jude Medical, Inc., 522 F.3d 836, 838 (8th Cir. 2008), "[i]n a typical common-law fraud case, a plaintiff must show that he or she received the defendant's alleged misrepresentation and relied on it." Claims requiring individual proof of reliance are generally not amenable to class certification because common evidence could not "suffice to make out a prima facie

-19-

case for the class." See Blades, 400 F.3d at 566. In the case of warranty and negligence claims premised on a universal and inherent product defect, however, plaintiffs may rely on common evidence to establish a prima facie case because there is no similar individual reliance requirement for such claims.[7] See Minn. Stat. § 336.2-313, cmt. 3; Lubbers v. Anderson, 539 N.W. 2d 398, 401 (Minn. 1995) (elements of a negligence claim); Peterson, 318 N.W. 2d at 52–53 (elements of a warranty claim).

While the existence of individual defenses may be important in a court's decision to certify a class, see St. Jude, 522 F.3d at 840, the relevance of such defenses must be subjected to the same rigorous inquiry as plaintiffs' claims. The district court examined Zurn's assertion that individual water conditions or faulty installation might have caused the alleged failures as opposed to a universal product defect. The court also considered the plaintiffs' argument that there was not sufficient evidence showing that individual conditions or installation differences may have caused SCC in Zurn's brass fittings.

With respect to the warranty claims the district court concluded that given the homeowner claim of a universal defect, the question of "proximate cause will not involve predominately individual determinations, and resolution of that issue would be common to the class." Similarly, with respect to the negligence claims the court determined that "[t]he question of liability does not require the specific individually

---

[7]The allegation that all of Zurn's brass fittings suffer from a universal defect along with the expert testimony which supports it differentiates this case from that recently considered by the Supreme Court in Wal-Mart v. Dukes. There, the plaintiffs sought certification of a nationwide class of over a million women who allegedly suffered sex discrimination by Wal-Mart. The Court concluded that the plaintiffs had not presented any "significant proof" that Wal-Mart had a "general policy of discrimination" which might have satisfied Rule 23(a)(2)'s commonality requirement. 2011 WL 2437013, at *8. Here, in contrast, the evidence of a universal defect raises a critical question common to all members of the classes certified by the district court.

tailored examinations proposed by Zurn." The district court stated that it was "convinced that the Plaintiffs have adduced sufficient evidence to support their theory of the case" in respect to the warranty and negligence claims.

The question at class certification is not whether the plaintiffs have already proven their claims through common evidence. Rather, it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions. Blades, 400 F.3d at 566–67. In light of the record and the district court's predominance analysis, we discern no abuse of discretion in its decision to grant class certification as to the warranty and negligence classes.[8] Merits discovery remains to be undertaken in the district court and as it continues, the bases for the district court's necessarily prospective rulings may change. The rules of civil procedure allow for flexibility if such changes are needed.

## VI.

After thoroughly reviewing the record made in the district court in light of the controlling law, we conclude that the district court did not commit legal error or abuse its discretion. Accordingly, its class certification order is affirmed.

GRUENDER, Circuit Judge, dissenting.

Because I conclude that the district court abused its discretion when it certified the breach of warranty class and the negligence class, I respectfully dissent.

---

[8]The dissent indicates that it doubts whether the district court conducted a sufficiently "rigorous analysis" of the class certification questions presented. We note that the experienced trial judge in this case issued a 31 page order, examining the evidence produced with respect to each Rule 23 requirement for the three proposed classes. The time restraints faced by busy trial courts make it unrealistic to expect exhaustive and polished opinions on all the legal issues before them.

## I.    DISCUSSION

### A.    Breach of Warranty Class—Standing

The court holds that those plaintiffs in the warranty class who own Zurn fittings that have not failed or leaked—the so-called "dry plaintiffs"—have suffered an injury and have stated "cognizable [claims] under Minnesota warranty law." *Ante* at 17. To reach this conclusion, the court improperly characterizes our precedent and overlooks the axiom that "liability does not exist in a vacuum; there must be a showing of some damage." *Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) (quoting *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 602 (S.D.N.Y. 1982)).

"On every writ of error or appeal, the first and fundamental question is that of jurisdiction." *Great So. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900). Failure to establish standing deprives this court of jurisdiction to hear the suit. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). The "core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The dry plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing that they have standing. *See id.* at 561. As such, a class may only "'be defined in such a way that anyone within it would have standing[,]' and . . . a named plaintiff cannot represent a class of persons who lack the ability to bring suit themselves." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)).

The party asserting standing must demonstrate that he "has suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 791-92 (8th Cir. 2004) (quoting *Lujan*, 504 U.S. at 560). As the court today notes, "the question whether [a plaintiff] has a cognizable injury sufficient to confer standing is closely bound up with

the question of whether and how the law will grant him relief." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) (stating that the inquiry into whether the party asserting standing has shown an injury in fact "often turns on the nature and source of the claim asserted"). We review a district court's determination that a party has standing *de novo*. *Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011).

"Courts have been particularly vigilant in requiring allegations of injury or damages in products liability cases." *Briehl*, 172 F.3d at 627. Central to the analysis is an allegation of not only an alleged defect, but also the manifestation of that defect. At this critical juncture in the analysis, the district court veered off course and applied the wrong legal standard: "Plaintiffs need only allege and prove that the brass fittings are defective and do not conform to the warranty. They are not required to allege and prove a manifestation of that defect." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 267 F.R.D. 544, 564 (D. Minn. 2010). Such a statement is without support in our circuit. In fact, "[i]t is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own." *Briehl*, 172 F.3d at 628 (quoting *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y. 1997)).

Although the court today applies the proper legal standard, it nonetheless holds that the dry plaintiffs have alleged a cognizable injury. In doing so, the court misapplies our decision in *O'Neil v. Simplicity, Inc.*, 574 F.3d 501 (8th Cir. 2009). In that case, John and Jill O'Neil purchased a crib that featured a drop-side mechanism—a mechanism allowing one side of the crib to be lowered, "making it easier to place a child into and remove it from the crib." *Id*. at 502. Four years after the O'Neils purchased the crib, the Consumer Product Safety Commission and the manufacturer "announced a voluntary recall of about one million cribs . . . prompted by a hardware defect that made it possible for the drop-side to detach from the crib, creating a dangerous gap in which a child could get caught." *Id.* The O'Neils sued the manufacturer for, *inter alia*, breach of express and implied warranties. *Id.* at 503.

The plaintiffs purported to represent a class of all persons in Minnesota who had purchased a crib, excluding any individuals who suffered a personal injury as a result of the allegedly defective crib.

In their brief to our court, the O'Neils argued that "Plaintiffs' crib contains a serious hardware defect that allows the drop side to separate from the crib frame. This hardware defect creates a gap that allows an infant or child to be trapped between the drop side and the crib frame. The defect is present in over 1 million of Defendants' cribs . . . ." In their reply brief, the O'Neils stressed that "each and every Graco crib has 'older-style hardware' that causes the drop side to detach from the crib frame and creates an entrapment gap that injures infants and small children. The Graco crib model that the Plaintiffs purchased for their grandchildren to sleep *has this defect*" (emphasis in original). Thus, the O'Neils argued, "Plaintiffs have pleaded the existed [sic] of a specific defect that has exhibited or 'manifested' itself in the Graco crib that the Plaintiffs own."

Our court was not persuaded. Even though the O'Neils alleged that their crib contained a defect that had manifested itself in the drop-side hardware, the court held that the O'Neils had failed to state a cognizable warranty claim because they had not alleged that "a separation [of the drop-side] ha[d] ever occurred in their crib." *O'Neil*, 574 F.3d at 503. For a claim to succeed, we held that "plaintiffs must allege that their product actually exhibited the alleged defect." *Id.* As such, where "a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies." *Id.* at 504 (quoting *Briehl*, 172 F.3d at 628). The O'Neils' claim failed because, while they alleged that the hardware defect was manifest in their crib, they did not allege that the defect resulted in the separation of the drop-side from the crib. In essence, we held in *O'Neil* that simply owning a product with an alleged defect does not give rise to a warranty claim until that defect causes the product to perform unsatisfactorily. *Id.* (finding that "the O'Neils' crib has not exhibited the alleged defect" even though the O'Neils alleged that a defect had manifested).

-24-

Just as the O'Neils alleged that the defect had "manifested" simply by the existence of the hardware in their crib, the dry plaintiffs here argue that "the chemical and physical process of [stress corrosion] cracking[] is already manifest in all systems." Likewise, just as the O'Neils failed to allege that the hardware defect resulted in the drop side separating from their crib, the dry plaintiffs fail to allege that the process of stress corrosion cracking has caused leaks in their Zurn fittings. *See id.* at 505 ("The O'Neils' crib performs just as it was intended, and thus there is no injury and no basis for relief.").

The court today misconstrues our decision in *O'Neil* in at least two ways. First, the court attempts to distinguish that decision by stating that the O'Neils "had not alleged that their cribs actually exhibited a dangerous defect that might have harmed their children" but instead only had alleged "a mere likelihood that a crib might develop a dangerous defect." *Ante* at 16. To the contrary, the O'Neils did not allege merely that their crib was *at risk* of developing a hardware defect; they expressly alleged that "each and every Graco crib" had defective hardware—a defect that might have harmed their children. We held that such allegations were insufficient because the hardware defect had not manifested itself: the drop-side had not separated from the crib and the crib continued to perform as intended. Second, the court attacks a straw man, stating that "*O'Neil* never indicated that a child would have to be injured by a crib for a defect to be manifest." *Ante* at 16. While true, this distinction sheds no light on the inquiry. If the O'Neils had alleged merely that their drop side had separated from their crib—with no accompanying allegation of injury to a child—the alleged defect in the crib's hardware would have manifested, the crib no longer would have functioned as intended, and the O'Neils would have had a cognizable claim. By analogy, if the dry plaintiffs had alleged that their Zurn fittings exhibited leaks, the alleged defect would be manifested, the plumbing products would no longer have functioned as intended, and the dry plaintiffs would have a cognizable claim. But the dry plaintiffs have not alleged this—and thus they have not alleged a sufficient injury to establish standing.

Like the O'Neils, the dry plaintiffs attempt to circumvent this problem by alleging that they have suffered an economic injury. According to the O'Neils' brief, they sought "the benefit of their bargain with Defendants, or the difference in the value of the crib they were promised, namely a fully functioning drop side crib . . . and what they received, a crib containing a hardware defect that makes the crib an unsafe environment for children and prevents the drop side from functioning as represented." According to the dry plaintiffs in the instant case, their economic injury includes "the decreased value—because of the inherent defects—of the plumbing itself" and "the cost of replacing systems." Further, the dry plaintiffs argue that the Zurn products they received—fittings subject to the process of stress corrosion cracking—do not conform with the products which they were promised—fittings that would "outlast the life of a home." We rejected the "benefit of the bargain" argument in *O'Neil*: "[t]he problem with this argument is that, because the O'Neils' crib has not exhibited the alleged defect, they have necessarily received the benefit of their bargain. The O'Neils purchased a crib with a functioning drop-side and that crib continues to have a functioning drop-side." *O'Neil*, 574 F.3d at 504. In other words, even though the O'Neils alleged that their crib exhibited defective hardware, they received the benefit of the bargain because the alleged defect had not resulted in the crib not performing as it was intended. Likewise, the dry plaintiffs purchased Zurn fittings that have functioned as intended from the date of purchase to the date they filed this litigation. Therefore, they too have received the benefit of the bargain.

The Fifth Circuit reached a similar conclusion in *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315 (5th Cir. 2002). In that case, Elizabeth Rivera purchased and ingested Duract, a Wyeth-manufactured painkiller. Soon after receiving complaints of liver failure from patients taking the drug, Wyeth removed Duract from the market. Rivera, for whom Duract functioned as intended and did not cause liver problems, sought to represent a class of "all patients who were prescribed, had purchased, and had ingested Duract but suffered *no* physical or emotional injury." *Id.* at 317. Rivera argued that she had suffered a concrete economic injury in that she had not received the benefit of the bargain because she purchased a defective drug that was thought to be much

safer than it was. Had patients known of Duract's risks to the liver, Rivera claimed she would have been able to purchase Duract for a lower price, presuming that riskier drugs command a lower market price. A panel of the Fifth Circuit unanimously disagreed and held that Rivera, and the members of the putative class, lacked standing because they had not alleged a concrete and particularized injury to a legally protected interest: "Rivera paid for an effective pain killer, and she received just that—the benefit of her bargain." *Id.* at 320. "Duract worked. Had Wyeth provided additional warnings or made Duract safer, the plaintiffs would be in the same position they occupy now." *Id.*

Just as the plaintiffs in *Rivera* and *O'Neil* received the benefit of their bargain, so too did the dry plaintiffs in this case. The dry plaintiffs bargained for, and now own, Zurn fittings that function exactly as intended.[9] *See id.*; *cf. In re Canon*

_____

[9] Allowing plaintiffs who own properly functioning Zurn fittings to sue under the benefit of the bargain theory is not only economically inefficient but also could result in double recovery. *See In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1017 (7th Cir. 2002) ("Plaintiffs describe the injury as financial rather than physical and seek to move the suit out of the tort domain and into that of contract (the vehicle was not the flawless one described and thus is not merchantable, a warranty theory) . . . . It is not clear that this maneuver actually moves the locus from tort to contract. If tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly mean excess compensation."). In *Bridgestone/Firestone*, Judge Easterbrook provided an apt illustration of why a mixed system of recovery in both contract and tort leads to inefficient outcomes:

> Consider an example. Defendant sells 1,000 widgets for $10,000 apiece. If 1% of the widgets fail as the result of an avoidable defect, and each injury creates a loss of $50,000, then the group will experience 10 failures, and the injured buyers will be entitled to $500,000 in tort damages. That is full compensation for the entire loss; a manufacturer should not spend more than $500,000 to make the widgets safer. Suppose, however, that uninjured buyers could collect damages on the theory that the risk of failure made each widget less valuable; had they known of the risk of injury, these buyers contend, they would have paid

-27-

*Cameras Litig.*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) ("A plaintiff who purchases a digital camera that never malfunctions over its ordinary period of use cannot be said to have received less than what he bargained for when he made the purchase.").

I would conclude that, until the defect they allege manifests so that their Zurn fittings no longer perform as intended, the dry plaintiffs have suffered no injury in fact—economic or otherwise—and, therefore, lack standing. *See O'Neil*, 574 F.3d at 505; *Rivera*, 283 F.3d at 320; *Briehl*, 172 F.3d at 628-29.

## B.     Breach of Warranty Class—Predominance

Questions of law and fact common to the remaining members of the breach of warranty class—those members whose Zurn plumbing products exhibit leaks and no longer perform as intended—do not predominate over questions affecting individual members. Thus, I would conclude that the putative breach of warranty class fails to meet the predominance requirement of Fed. R. Civ. P. 23(b)(3).

"A court may certify a class under Rule 23(b)(3) only if it finds that . . . the questions of law or fact common to the members of the class predominate over any

---

only $9,500 per widget—for the expected per-widget cost of injury is $500, and each buyer could have used the difference in price to purchase insurance (or to self-insure, bearing the risk in exchange for the lower price). On this theory the 990 uninjured buyers would collect a total of $495,000. The manufacturer's full outlay of $995,000 ($500,000 to the 10 injured buyers + $495,000 to the 990 uninjured buyers) would be nearly double the total loss created by the product's defect. This would both overcompensate buyers as a class and induce manufacturers to spend inefficiently much to reduce the risks of defects. A consistent system—$500 in damages to every buyer, or $50,000 in damages to every injured buyer—creates both the right compensation and the right incentives. A mixed system overcompensates buyers and leads to excess precautions.

*Id*. at 1017 n.1 (internal citations omitted).

questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (citing Fed. R. Civ. P. 23(b)(3)); *see also Avritt*, 615 F.3d at 1029. "In making its [predominance] determination, the district court must undertake a 'rigorous analysis' that includes examination of what the parties would be required to prove at trial." *Avritt*, 615 F.3d at 1029 (citing *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006)). "The court may also be called upon to 'resolve disputes concerning the factual setting of the case.'" *Id*. (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005)).

Such a rigorous analysis is even more appropriate in light of the amendments made to Rule 23 in 2003. "First, the amended rule removes from prior Rule 23(c)(1)(C) the provision that class certification 'may be conditional.' Second, the amended rule replaces the provision of prior Rule 23(c)(1)(A) that a class certification decision be made 'as soon as practicable' with a provision requiring the decision 'at an early practicable time.'" *Miles v. Merrill Lynch & Co., (In re Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24, 39 (2d Cir. 2006). Moreover, "the Advisory Committee states that '[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met.'" *Id.* (alteration in original) (citing Fed. R. Civ. P. 23(c)(1)(C) Adv. Comm. Notes 2003).

Before it determined that the breach of warranty class met the predominance requirement, the district court conceded that, "[b]ecause Zurn's warranty specifically excludes failures due to improper installation and corrosive water quality, individual questions of proximate cause may exist as to class members whose Zurn[] brass crimp fittings have already failed and who have suffered resulting property damage." *In re Zurn Pex Plumbing*, 267 F.R.D. at 563. The district court concluded, however, that because the vast majority of the class had "not suffered property damage and seek only replacement of a nonconforming product," proximate cause issues would not predominate. *Id.*

Because I would hold that the dry plaintiffs lack standing, the only remaining members of the putative breach of warranty class are those whose fittings already have leaked. For these remaining plaintiffs, individual questions of causation predominate over common questions. To establish a warranty claim in Minnesota, a plaintiff must prove (1) the existence of a warranty, (2) a breach of that warranty, and (3) a causal link between the breach and the alleged harm. *See Peterson v. Bendix Home Sys., Inc.*, 318 N.W.2d 50, 52-53 (Minn. 1982). The Zurn express warranty excludes failures or leaks caused by, *inter alia*, "damage due to tear, breaks or other external damages before, during, or after installation," "exposure to harmful, unauthorized, or unanticipated chemicals or substances or corrosive water conditions," and "damage or wear from abnormal operating conditions, accident, abuse, misuse, or unauthorized alterations or repair." Zurn's expert opined that those plaintiffs who relied on well water or used water softeners subjected their fittings to an extremely corrosive environment. As such, for the plaintiffs to prove that their Zurn fittings failed because of stress corrosion cracking and not because of any one of the number of reasons excluded from warranty coverage, the district court will be forced to engage in individual factual inquiries regarding the installation and operating conditions of each homeowner's Zurn plumbing products. Even if all Zurn fittings *eventually* will fail from stress corrosion cracking, another factor, like improper installation, abnormal operation, or exposure to corrosive water conditions, still may have caused the failure and property damage experienced by these plaintiffs. In other words, even "if the plaintiff[s'] general allegations are true,"[10] *Blades*, 400 F.3d at 566, common evidence

---

[10] While the court in *Blades* employed this language, *Blades*, 400 F.3d at 566, it went on to require that a district court conduct a rigorous analysis that "may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case," *id.* at 567. Since our decision in *Blades*, our court has continued to emphasize that district courts must "undertake a 'rigorous analysis' that includes examination of what the parties would be required to prove at trial." *Avritt*, 615 F.3d at 1029 (quoting *Elizabeth M.*, 458 F.3d at 786). Engaging in such a rigorous analysis comports with my view that "[t]he proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it." *Szabo*, 249 F.3d at 675; *accord In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir.

would be insufficient for these plaintiffs to prove their breach of warranty claim. Therefore, I would conclude that the district court abused its discretion by certifying the breach of warranty class.

### C. Negligence Class—Predominance

Similar individual issues of causation predominate over common issues for those plaintiffs in the negligence class. The district court found that "[a] fact question does exist as to whether the failures are due to a single cause or multiple causes. If Plaintiffs can prove that the crimp fittings suffer from a uniform, inherent design and manufacturing defect, and that the defect is the only cause of failure in the majority of the cases, then proximate cause will not involve predominantly individual determinations." *In re Zurn Pex Plumbing*, 267 F.R.D. at 565. This conclusion is problematic. As an initial matter, the district court's reasoning is circular: essentially, according the district court, if the plaintiffs can prove proximate causation through common evidence, "then proximate cause will not involve predominantly individual determinations." *See id.* This conclusion is merely a restatement of the predominance inquiry.

More importantly, to show that stress corrosion cracking was the proximate cause of the failure, each plaintiff will need to prove that his property damage was caused by an inherent defect in Zurn's fittings—and, alternatively, not caused by corrosive water conditions, improper installation, improper use, abnormal operating conditions, or another factor. As such, this inquiry will be inherently individual in nature and not conducive to class-wide resolution. Moreover, Zurn has presented expert testimony that stress corrosion cracking occurs only when its fittings are subjected to unusual stress and a corrosive environment. The district court did not

2008); *Brown v. Am. Honda (In re New Motor Vehicles Can. Export Antitrust Litig.)*, 522 F.3d 6, 26 (1st Cir. 2008); *Miles*, 471 F.3d at 33, 41-42; *Unger v. Amedisys Inc.*, 401 F.3d 316, 321-22 (5th Cir. 2005); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004).

undertake a "rigorous analysis" regarding the contradictory testimony of the parties' experts to determine whether stress corrosion cracking requires a corrosive environment or whether stress corrosion cracking occurs in any water within the lifetime of the fittings. Without resolving this question, I see no way to determine whether common proof is sufficient for the plaintiffs' case to succeed. While this inquiry bleeds into the merits, it is necessary to determine the factual setting of the case. "A district judge may not duck hard questions by observing that each side has some support, or that considerations relevant to class certification also may affect the decision on the merits. Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives." *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002). Therefore, because individual issues of causation predominate over common issues, I conclude that the district court also abused its discretion by certifying the negligence class.

## D.     *Daubert* and Class Certification

While I would not have reached the question of whether the district court should have conducted a full inquiry into the admissibility of the plaintiffs' experts' testimony under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), I disagree with the court's discussion and analysis of this issue.

First, the court errs by characterizing our decision in *Blades* as controlling this question, *see ante* at 9, because *Blades* did not address it. In *Blades*, the defendants asked the district court to conduct a full *Daubert* inquiry into the admissibility of the testimony of the plaintiffs' key expert. The district court refused to address admissibility under *Daubert*, stating that "I believe it is appropriate for me to consider all evidence at this stage of the proceedings." *Blades*, 400 F.3d at 569 (quoting the district court). After the district court considered the plaintiffs' expert evidence, it ruled in favor of the defendants, determining that the "[expert] testimony does not show that impact can be demonstrated on a class-wide basis." *Id.* (quoting the district

court). We affirmed and held that, "in ruling on class certification, a court may be required to resolve disputes concerning the factual setting of the case. This extends to the resolution of expert disputes concerning the import of evidence concerning the factual setting . . . ." *Id.* at 575. "[W]e believe the district court's *findings as to the experts' disputes* were properly limited to whether, if appellants' basic allegations were true, common evidence could suffice, given the factual setting of the case, to show classwide injury." *Id.* (emphasis added).

Thus, our decision in *Blades* addressed the scope of the district court's fact finding with respect to conflicting expert testimony, not whether the testimony should have been admitted in the first place. Because the defendants in *Blades* prevailed in the district court and, therefore, did not appeal the district court's refusal to conduct a full *Daubert* analysis, the court in *Blades* simply was not presented with and did not decide the question of the admissibility of the proffered expert evidence under *Daubert*. As such, the question of the appropriate scope of a district court's *Daubert* inquiry at the class certification stage was not decided by the court in *Blades* and has remained an open question until the court's decision today.

To resolve this open question, I note first that the Supreme Court has expressed disapproval of the position taken by the court today. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ---, 2011 WL 2437013, at *8 (U.S. Jun. 20, 2011) ("The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so . . . ." (internal citation omitted)). "The statement, to be sure, is dictum, . . . but inferior courts can take their cues from the Supreme Court's dicta." *Scheduled Skyways, Inc. v. Nat'l Mediation Bd.*, 738 F.2d 339, 342 (8th Cir. 1984). Second, I find appropriate the standard expounded by two of our sister circuits. In *American Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010) (per curiam), the district court certified a class of Honda motorcycle purchasers who alleged that the front steering assembly of their GL 1800 motorcycles "wobble[d]," or shook excessively. *Id.* at 814. Plaintiffs' expert stated that any wobble or oscillation of the steering assembly should dissipate within one

second so as to prevent riders from reacting to it. Based on the test of one GL 1800 motorcycle, the expert concluded that all GL 1800 motorcycles failed the standard he had devised and, thus, were defective. Honda argued that the expert's opinions failed the reliability standards established by *Daubert*. While the district court expressed reservations about the reliability of the opinions, the court declined to strike the expert's report "at this early stage of the proceedings," *id*. at 815 (quoting the district court), and granted plaintiffs' motion for class certification.

The Seventh Circuit reversed and held that, "when an expert's report or testimony is critical to class certification, as it is here[,] . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion. That is, the district court must perform a full *Daubert* analysis before certifying the class if the situation warrants." *Id.* at 815-16. Because plaintiffs relied on their expert's opinion that there was a defect common to all GL 1800 motorcycles to meet the Rule 23(b)(3) predominance requirement and because the district court must determine predominance before certifying a class, the Seventh Circuit concluded that the district court could not defer a conclusive analysis of the reliability and admissibility of this evidence to a later date.

The Eleventh Circuit applied *American Honda*'s holding in *Sher v. Raytheon Co.*, --- F. App'x ----, 2011 WL 814379 (11th Cir. Mar. 9, 2011) (unpublished) (Hill, J.). The district court in *Sher* had certified a class despite marked differences between the expert testimony presented by the parties, stating:

> [I]t is not necessary at this stage of the litigation to declare a proverbial winner in the parties' war of the battling experts or dueling statistics and chemical concentrations . . . . This type of determination would require the Court to weigh the evidence presented and engage in a *Daubert* style critique of the proffered experts qualifications, which would be inappropriate . . . . At this stage of the litigation, therefore an inquiry into the admissibility of Plaintiffs' proposed expert testimony as set forth in *Daubert* would be inappropriate, because such an analysis delves too far into the merits of Plaintiffs' case.

*Sher*, 2011 WL 814379, at *2 (second and third alterations in original) (quoting the district court).  The Eleventh Circuit reversed:

> The *American Honda* court found that, if the situation warrants, the district court must perform a full *Daubert* analysis before certifying the class.  "A district court is the gatekeeper.  It must determine the reliability of the expert's experience and training as well as the methodology used.  The [district] court must also resolve any challenge to the reliability of information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification."  We agree.

*Id.* at *3 (alteration in original) (internal citations omitted) (quoting *Am. Honda*, 600 F.3d at 815-16).  The Eleventh Circuit went on to hold that the "district court erred as a matter of law by not sufficiently evaluating and weighing conflicting expert testimony on class certification.  It was error for the district court to decline to declare a proverbial, yet tentative winner.  The Plaintiffs are required to prove, at the class certification stage, more than just a *prima facie* case, *i.e.*, more than just a 'pretty good case.'"  *Id.* (internal citations omitted).

If I were to reach the issue, I would join the Seventh and Eleventh Circuits and resolve this open question in our circuit by requiring district courts to conduct a full *Daubert* analysis before certifying a class whenever an expert's opinion is central to class certification and the reliability of that opinion is challenged.  I reach this conclusion for a number of reasons.  First, the 2003 amendments to Rule 23 removed the provision that class certification "may be conditional."  *See Miles*, 471 F.3d at 39; Fed. R. Civ. P. 23(c)(1)(C).  Requiring a full *Daubert* analysis is a natural extension of the concept that class certification should not be conditional and should be permitted only after a rigorous application of Rule 23's requirements.  *See Wal-Mart Stores*, 564 U.S. ---, 2011 WL 2437013, at *7-8; *Miles*, 471 F.3d at 39-41.

Second, I find it counterintuitive to allow district courts to utilize inadmissible expert testimony to resolve factual disputes at the class certification stage. In *Blades*, we held that:

> The preliminary inquiry at the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case. Nonetheless, such disputes may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class. The closer any dispute at the class certification stage comes to the heart of the claim, the more cautious the court should be in ensuring that it must be resolved in order to determine the nature of the evidence the plaintiff would require.

*Blades*, 400 F.3d at 567 (internal citations omitted). The purpose of conducting a *Daubert* inquiry is to ensure the relevance and reliability of expert testimony. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). These principles are equally applicable in the context of class certification. *See Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 639 (9th Cir 2010) (Ikuta, J., dissenting), *rev'd*, 564 U.S. ---, 2011 WL 2437013. The district court must "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit." *Miles*, 471 F.3d at 42; *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 323 ("Expert opinion with respect to class certification, like any matter relevant to a Rule 23 requirement, calls for rigorous analysis.").

Just as in *American Honda*, the district court's statement in the instant case as to the admissibility of Staehle and Blischke's testimony and reports "is not even

conclusory; it leaves open the questions of what portions of [the experts'] testimony it may have decided (or will decide) to exclude." *Am. Honda*, 600 F.3d at 816 (holding that the district court's refusal to conclusively determine, before certifying a class, whether the "expert report was reliable enough to support Plaintiffs' class certification request" was an abuse of discretion). "Like any other evidence, expert evidence introduced to 'establish a component of a Rule 23 requirement' must be reliable; it is not enough that the expert testimony is 'not fatally flawed.'" *Dukes*, 603 F.3d at 639 (Ikuta, J., dissenting) (quoting *Miles*, 471 F.3d at 42); *see also Pecover v. Elec. Arts Inc.*, No. C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632, at *8 (N.D. Cal. Dec. 21, 2010) ("Given that class actions consume vast judicial resources and that many defendants face substantial settlement pressures as a result of class certification, . . . it hardly seems appropriate to allow flimsy expert opinions to buttress plaintiffs' [Rule] 23 arguments. . . . [A] *Daubert* analysis of every challenged expert opinion seems prudent in fulfilling the court's obligation to ensure actual conformance with [Rule] 23 . . . .").

Plaintiffs advance two reasons why this court should not adopt the *American Honda* standard. First, plaintiffs argue that mandating a full *Daubert* analysis at the class certification stage "would render the 'early practicable time' language of Rule 23 virtually meaningless" and "would ignore limitations of the information available to the experts created by . . . bifurcated discovery." However, because class certifications are no longer conditional, a district court should delay certifying a class until it is satisfied that all Rule 23 requirements have been met, even if additional targeted discovery is needed to assess the reliability of an expert's opinions. Importantly, requiring a district court to conduct a full *Daubert* analysis before certifying a class discourages plaintiffs who may have no intention of proceeding to a trial on the merits from submitting unreliable expert testimony for settlement purposes. *See Schleicher v. Wendt*, 618 F.3d 679, 682-83 (7th Cir. 2010) (noting that "certification substantially increases the settlement value" of suits); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc. (In re Visa Check/MasterMoney Antitrust Litig.)*, 280 F.3d 124, 145 (2d Cir. 2001) ("The effect of certification on parties' leverage in settlement

negotiations is a fact of life."), *overruled on other grounds by Miles*, 471 F.3d 24; *Szabo*, 249 F.3d at 675 (noting that class certification "puts a bet-your-company decision to [defendant's] managers and may induce a substantial settlement even if the customers' position is weak").

Second, plaintiffs argue that mandating a full *Daubert* analysis at the class certification stage "is also unnecessary because expert opinions at class certification are considered by an Article III judge" and not by a jury. The court agrees with this position. *Ante* at 10. I believe, however, that this argument misses the mark. Our concern should not be that the district judge cannot weigh *admissible* expert testimony properly. We should be concerned, instead, that the case will proceed beyond class certification on the basis of *inadmissible*, unreliable expert testimony. "[E]xpert testimony that is not scientifically reliable should not be admitted, even 'at this early stage of the proceedings.'" *Am. Honda*, 600 F.3d at 819 (internal quotation marks omitted).

As such, were I to reach this question in the instant case, I would reverse the district court's decision to certify the breach of warranty class and the negligence class and remand the case to the district court to conduct a full *Daubert* inquiry as to the admissibility of Staehle and Blischke's testimony.[11]

_____

[11] Such a full *Daubert* analysis would have been particularly apt in this case as the district court relied on the questionable expert testimony of Dr. Blischke when it certified the breach of warranty class. According to the district court, Dr. Blischke "concluded that the fittings have a mean time to failure of 40 years, which means approximately half of the units will likely fail within 40 years and approximately half will fail after." *In re Zurn Pex Plumbing*, 267 F.R.D. at 556. However, this statement is troublesome in two respects. First, Dr. Blischke did not *conclude* that the fittings have a mean time to failure of 40 years; he *assumed* an average mean-time-to-failure rate of 40 years—a number derived from a Zurn erosion test that showed that its fittings did not display any erosion after 40 years. Second, Dr. Blischke's assumption is unreliable on its face: while *no fitting failed* in the Zurn test after 40 years' worth of water had passed through it, Dr. Blischke assumed that *half of the fittings will fail* within 40 years.

## II.  CONCLUSION

Because I would conclude that the dry plaintiffs have failed to allege an injury in fact and, therefore, lack standing, and because individual issues predominate over common issues for those plaintiffs remaining in the breach of warranty class, I would reverse the district court's certification of the breach of warranty class.  Because I would conclude that individual issues predominate over common issues for those plaintiffs in the negligence class, I would reverse the district court's certification of the negligence class as well.  Thus, I respectfully dissent.

_____